UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUZANNE STEINMEIER,<br><br>                              Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO; SAN DIEGO COUNTY SHERIFF'S DEPARTMENT; SHERIFF WILLIAM GORE; FRANK LEYVA; KENNETH EDWARDS; PETER ALVARADO; BRIAN KEENE; WILLIS WHITED; and DOES 3 through 10,<br><br>                              Defendants. | Case No.:  18cv1603 JM (WVG)<br><br><br>**AMENDED[1] ORDER DENYING DEPUTY FRANK LEYVA'S AND DEPUTY KENNETH EDWARDS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION** |

        In this civil rights action under 42 U.S.C. § 1983, Plaintiff Suzanne Steinmeier ("Plaintiff") alleges San Diego County Sheriff's Deputies Frank Leyva and Kenneth Edwards ("the Deputies") used excessive force in violation of her Fourth Amendment rights when they struck her multiple times after she kicked a police dog that was biting her wife.  The Deputies now move for summary judgment.  (Doc. No. 34.)  The motion has been fully briefed and the court finds it suitable for submission on the papers and without oral argument in accordance with Civil Local Rule 7.1(d)(1).  For the below reasons, the motion is **DENIED**.

_____

[1] This order amends the court's January 16, 2020 order (Doc. No. 70) by correcting the citation in *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1079 (9th Cir. 2013).

## I.    FACTUAL BACKGROUND

The parties do not dispute that on the evening of April 27, 2015, Plaintiff was driving in Riverside County with her wife, Michelle Rivera ("Rivera"), as a passenger.  After being pulled over by a California Highway Patrol (CHP) officer for a broken side mirror, they were informed they both had felony warrants and would be arrested.  Plaintiff drove away from the scene and CHP Officers and San Diego County Sheriff's Deputies pursued.  A police helicopter joined the chase.  Plaintiff sped, ran stop lights, and drove on the wrong side of the road.  The vehicle pursuit lasted over 45 minutes.  Plaintiff eventually stopped the vehicle on a rural road near where she and Rivera lived.  They exited the vehicle, slid down a hill into a dry riverbed, and walked and ran along the riverbed for eight minutes until they stopped and laid down on their backs under some trees.  The riverbed into which they fled was dark and rugged.  They could be seen, however, by the helicopter crew using night-vision equipment.  The helicopter crew advised the officers on the ground as to the suspects' movements and location.  Plaintiff and Rivera laid underneath the trees for 22 minutes until the Deputies reached them.  At this point, the parties' accounts diverge.

### 1.    Plaintiff's Account

According to Plaintiff, while lying on her back, she saw a flashlight and immediately put her hands up.  (Doc. No. 43 at 79:7-8, 91:1-6, 109:6-11.)  The officer holding the flashlight was a "few feet" in front of her.  (*Id.* at 69:12.)  Right after seeing the flashlight, she saw a dog about ten feet away from her feet, (*id.* at 70:1-2, 12-14; 71:3-12), but it ran past her, (*id.* at 71:2-5).  Plaintiff understood the dog was trying to locate her.  (*Id.* at 70:18-24.)  The dog went back to the handler and sat down at the officer's feet.  (*Id.* at 72: 6-10, 17-18.)  The dog looked up at the handler like the dog had done something good.  (*Id.* at 109:18-19.)  Plaintiff saw the handler staring at them.[2]  (*Id.* at 72:23.)  She and Rivera had their hands up and said, "we surrender."  (*Id.* at 73:1-10.)  The police were "already around"

---

[2] Plaintiff later stated that she believed the dog handler was Deputy Leyva.  (Doc. No. 43 at 9-13.)

them. (*Id.* at 109:13.) She was illuminated by multiple flashlights and there were no bushes or boulders between her and the officers. (*Id.* at 72:11-14, 93:2-9.) The dog was "re-released," (*id.* at 73:12, 108:3-14), and began biting Rivera on her inner thigh, (*id.* at 72:15-16), but at that point Plaintiff did not attempt to assist Rivera.[3] (*Id.* at 73:22-24.) The police "may have" said something prior to the bite. (Doc. No. 34-9 at 55-56.) While handcuffed or while being handcuffed, Plaintiff kicked the dog about three or four times. (Doc. No. 43 at 74:2-20.) The dog handler did not say anything to Plaintiff. (*Id.* at 75:2-4.) She then got flipped over onto her stomach. (*Id.* at 75:7.) After being handcuffed, she was hit on her back and head multiple times with a fist and an object that she believed was a flashlight. (*Id.* at 76:1-9.) Plaintiff also claims that at some point Deputy Leyva said, "that's what you get, you dyke bitch." (Doc. No. 43 at 77:9-15.)

## 2. The Deputies' Accounts

According to Deputy Leyva, when he and his police dog Bary ("Bary") arrived on the scene, he was informed that two suspects were lying down somewhere in the dark riverbed area. (Doc. No. 34-9 at 96:2-7.) He was aware the suspects had felony arrest warrants and had just led police on a lengthy chase. (*Id.* at 98:4-9.) He was not familiar with the area, (*id.* at 108:5-12), but knew the suspects were familiar with the area, (Doc. No. 34-3 at 3:11-13). At the beginning of his search, before entering the dark riverbed, he yelled for the suspects to come out or they would be bitten. (Doc. No. 34-9 at 111:15-112:14.) After walking a "good distance," (*id.* at 114:16-20), the helicopter guided him to

_____

[3] At a deposition on September 6, 2019, Plaintiff testified:

> We surrendered, our hands were in the air, and he – like there was flashlights on us, we had our hands in the air, the cops – the dog already had passed us. Like, he came – the dog came initially – I wouldn't even be sitting here if the dog bit us first. But he went past us, the dog went back to his handler, like by to Leyva, and Leyva like was mad at the dog, and he was like yanking him and making him go back and bite us.

(Doc. No. 46-3 at 16:11-20.)

18cv1603 JM (WVG)

the "general area" of the suspects, (*id.* at 100:16-17, 114:20). Deputy Leyva claims he saw "silhouettes" and "figures or whatever."[4] (*Id.* at 102:14-17; 116:19-20.) He did not have his flashlight out, but could see despite the darkness because there were five or six officers behind him with flashlights.[5] (*Id.* at 110:16-17.) There were bushes, rocks, branches, foliage and a small hill obstructing his view. (*Id.* at 114:21-115:20.)

When Deputy Leyva saw the figures or silhouettes, he pointed in that direction and gave Bary an apprehension command. (*Id.* at 116:21-23.) Deputy Leyva then saw Bary biting Rivera and saw Plaintiff kicking Bary. (Doc. 34-9 at 122.) He heard Plaintiff yelling at him to get the dog off her. (*Id.*) He twice told her to stop kicking his dog, but she did not obey. (*Id.*) Neither suspect was handcuffed at that point. (*Id.*) Deputy Leyva testified that he lunged forward on top of Plaintiff and hit her in the face.[6] (*Id.* at 123.) When he struck her, she stopped kicking Bary because it pushed her away just slightly. (*Id.*) He then glanced over and saw uniforms to his right, and got off Plaintiff because he wanted to grab Bary and get him off Rivera. (*Id.*) The other deputies were trying to get Plaintiff secured in handcuffs. (*Id.*) Deputy Leyva testified he did not remember seeing her hands, (*id.* at 124), but in a subsequent declaration, he stated he could not see her right hand. (Doc. No. 34-3 at 4:14.)

---

[4] Deputy Leyva later testified, "I don't believe I ever had a clear visual of exactly what it was. I just knew it stuck out in the area." (Doc. No. 34-9 at 101:13-14; *see also id.* at 116:8-9 ("I just caught something out of my peripheral that didn't fit where we were. . . . I never saw them. I saw two figures or silhouettes out there, like I said, something that didn't match the area."); *id.* at 117:2-3 ("I couldn't see a hundred percent what it was or who it was[.]").)

[5] Deputy Leyva later testified, "if they turn their light on, it's going to give me a little bit of light, and that's all I need to be able to move forward. I don't believe that they were ever so far behind me that I couldn't see at least a little bit out in front of me." (Doc. No. 34-9 at 110:18-21.)

[6] In his declaration, Deputy Leyva states he struck Plaintiff once in her right cheek with a closed fist. (Doc. No. 34-3 at 13.)

According to Deputy Edwards, he was following 20 to 30 feet behind Deputy Leyva with his flashlight on. (Doc. No. 34-9 at 138:13-16.) He heard Bary barking and a female screaming and ran over to the area. (*Id.* at 157:7-9.) He saw Bary biting Rivera and Deputy Leyva on top of Plaintiff while both suspects were on their backs. (*Id.* at 139.) Plaintiff was trying to kick Bary, and Deputy Leyva was yelling to get off the dog. (*Id.* at 140:1-2.) Deputy Edwards told Deputy Leyva to get off Plaintiff so that Deputy Leyva could get Bary. (*Id.* at 142:7-9.) When Deputy Leyva got off the Plaintiff, she flipped over onto her stomach and Deputy Edwards jumped on her. (*Id.* at 142:13-15, 158:4-7.) Deputy Edwards recognized Plaintiff from her warrant photo and told her to put her hands behind her back, but she did not comply. (*Id.* at 142:22-143:7.) Deputy Edwards claims she put her hands in her waistband. (*Id.* at 158:6-7.) He struck her with his flashlight in the right shoulder area. (*Id.* at 144:2-9.) She did not comply. (Doc. No. 34-2 at 4:25-5:2.) He struck her three more times. (*Id.* at 5:1-2.) He and another Deputy then handcuffed Plaintiff. (Doc. No. 34-9 at 141:10-12.)

## II.    PROCEDURAL HISTORY

On March 24, 2017, Plaintiff and Rivera filed a complaint in state court under 42 U.S.C. § 1983 alleging violation of their Fourth Amendment right to be free from excessive force by police.[7] (Doc. No. 1-3.) As Defendants, she named: (1) the County of San Diego; (2) the San Diego County Sheriff's Department; (3) Sheriff William Gore; (4) Deputy Leyva; (5) Deputy Edwards; (6) Deputy Peter Alvarado; and (6) and Does 1 through 10, in both their individual and official capacities. (Doc. No. 1 at 2, 1-5 at 4.) Rivera subsequently dismissed her claims against all Defendants on July 24, 2017. (Doc.

---

[7] Much of the material provided by the parties here, including deposition and trial testimony, was part of a concurrent lawsuit based on the same events brought solely by Rivera in the U.S. District Court for the Central District of California on April 26, 2016. *See Rivera v. Cty. of San Diego*, Case No. ED CV 16-795 PSG (KSx), 2017 WL 5643151, at *1 (C.D. Cal. Nov. 14, 2017). The case went to trial on June 29, 2017, and the jury returned a verdict in favor of the Defendants. *Id.* The verdict was subsequently affirmed. 771 F. App'x 436, 437 (9th Cir. 2019).

No. 1-5 at 98-100.)  Rivera was thus voluntarily dismissed from the action without prejudice, leaving Steinmeier as the only Plaintiff.  (*Id.*)  On June 12, 2018, Plaintiff amended the Complaint by identifying CHP Officers Brian Keene as Doe 1, (Doc. No. 1-3 at 4), and Willis Whited as Doe 2, (Doc. No. 1-4).  Keene and Whited removed this action to federal court on July 16, 2018.  (Doc. No. 1.)  On August 29, 2019, Deputies Leyva and Edwards filed the instant motion for summary judgment.  (Doc. No. 34-1.)  Plaintiff filed a response in opposition on September 16, 2019, (Doc. No. 42), and Defendants filed a reply on September 23, 2019, (Doc. No. 46).

## III.  LEGAL STANDARD

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The court must examine the evidence in the light most favorable to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Any doubt as to the existence of any issue of material fact requires denial of the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."  *SEC v. Seaboard,* 677 F.2d 1301, 1306 (9th Cir. 1982).  Summary judgment can only be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict."  *Anderson,* 477 U.S. at 250.  The court may not weigh evidence or make credibility determinations.  *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986).

## IV.  DISCUSSION

Constitutional violations by persons acting under the color of state law may be redressed by bringing suit in federal court under 42 U.S.C. § 1983.  *Gomez v. Toledo*, 446 U.S. 635, 639 (1980).  In a section 1983 claim, the plaintiff must show (1) the action

occurred "under color of state law," and (2) resulted in the deprivation of rights under the Constitution or federal statute. *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted).

Under the Fourth Amendment, the force used by police must be objectively reasonable when considering the totality of the circumstances. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). The objective reasonableness of the force involves a three-part inquiry. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court should first examine the type and amount of force used, then assess the government's interests in using the force by looking at "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape." *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013). These factors are non-exhaustive. *Id.* The third step is to balance the degree of force against the government interest at stake to determine if the force used was "greater than is reasonable under the circumstance." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This determination is "ordinarily a question of fact for the jury." *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997). Accordingly, in excessive force cases, "summary judgment should be granted sparingly." *Maxwell*, 708 F.3d at 1086; *see also Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc). For the below reasons, summary judgment cannot be granted because genuine disputes of material fact exist.

### A. Genuine Disputes of Material Fact

As discussed above, the parties offer starkly different accounts of what transpired the night of April 27, 2015 during the critical few seconds when Plaintiff and Rivera were apprehended. These differing accounts raise several genuine disputes of material fact. First, the parties dispute whether Plaintiff and Rivera had visibly surrendered prior to

Deputy Leyva commanding Bary to apprehend them. Plaintiff claims that Deputy Leyva commanded Bary to attack even though Deputy Leyva saw they were lying down, with their hands raised, and they said, "we surrender." (Doc. No. 42 at 7-9.) Plaintiff testified that she saw Deputy Leyva staring at them. (Doc. No. 43 at 72:23.) The video also shows that before Bary bit Rivera, one officer was only a few feet away from the suspects and another officer was close by. In contrast, Deputy Leyva claims that when he gave Bary the apprehension command, he saw "two silhouettes laying in the brush underneath a tree," but never had a "clear visual" of the silhouettes because it was dark. (Doc. No. 34-1 at 11-12.) He denies the suspects were illuminated by flashlights or that he saw or heard them surrender.[8] (Doc. No. 34-3 at 4:9-10.)

Second, the parties dispute when Plaintiff was handcuffed and when force was used. Plaintiff claims she was struck *after* being handcuffed and placed on her stomach.[9] (Doc. No. 43 at 75:2-4, 75:7, 76:1-9, 81:16:23.) In contrast, Deputy Leyva claims he punched

---

[8] The Deputies claim that Plaintiff admitted to surrendering "just prior" to Rivera being bitten, which was too late to factor into the analysis. (Doc. No. 34-1 at 11-12 n.6.) Plaintiff actually testified that it was 20 to 30 seconds from when she first raised her hands to when Bary bit Rivera. (Doc. No. 34-9 at 23.) The question of whether 20 to 30 seconds was enough time for Deputy Leyva to have called off Bary is one appropriate for resolution at trial, not summary judgment.

[9] Plaintiff admits she kicked Bary while being handcuffed or after she was handcuffed. (Doc. No. 43 at 74:2-5.) Plaintiff does not specify, however, the precise point at which she was handcuffed or when she kicked Bary. Taking the facts in the light most favorable to Plaintiff, she alleges she was handcuffed before she was struck, or at the very least, while be restrained on the ground. When asked when she began kicking Bary, Plaintiff initially testified "I believe it was after the officers are handcuffing me." (*Id*. at 74:2-5; *see also id.* at 74:12-14 ("Q: And what did you do as they were – were they able to handcuff you? A: They – I started kicking the dog.").) Plaintiff subsequently testified that when she began kicking the dog, an officer flipped her over onto her stomach, (*id.* at 75:5-9), and she was hit with what she believed was a fist and object, (*id.* at 76:1-9). Plaintiff was asked whether the officer was able to handcuff her at that point and Plaintiff responded, "I was already handcuffed" and "I was handcuffed the whole time." (*Id.* at 76:12-14.) During her most recent deposition, Plaintiff testified that she did not know when police started trying to handcuff her. (*Id*. at 110:23-25; *see also* Doc. Nos. 34-9 at 52, 46-3:3-13.

18cv1603 JM (WVG)

Plaintiff while she was on her back, while she was kicking Bary, after he repeatedly told her to stop, before he could see her right hand, and before she was handcuffed. (Doc. No. 34-3 at 4:13-18.) Deputy Edwards claims he struck Plaintiff while she was on her stomach with her hand in her waistband, before she was handcuffed, and after she repeatedly refused his commands to show him her hands. (Doc. No. 34-2 at 4:25-5:2.)

Third, the parties dispute what force was used. As noted above, Deputy Leyva admits he punched Plaintiff once on the right cheek, (Doc. No. 34-3 at 4:13-18), and Deputy Edwards admits he hit Plaintiff four times with his flashlight in the right shoulder area, (Doc. No. 34-2 at 4:25-5:2.) In contrast, Plaintiff initially claimed she was hit with the flashlight between 10 and 20 times. (Doc. No. 43 at 76:10-11.) Plaintiff does not claim she was hit in the face. (Doc. No. 42 at 11:27.) Plaintiff later testified that after she was rolled onto her stomach she felt "like dumps, like hits or whatever" on her head and neck area. (Doc. No. 46-3 at 9-10.) She did not know the number of times she was hit on her head and back area, but stated that it was "a few" and "less than 10 maybe." (*Id.* at 10:8-9.) She then stated that "it might have been" the 10 to 20 number she previously stated, (*id.* at 10:11-22), but went back and forth about whether her previous testimony that she was hit 10 to 20 times was accurate, stating:

> I don't know if it's incorrect. I feel different. I don't think that now. I think it's less. . . . I think the number I may have given was – sounded like way – and like too much, but – not that I was doing anything like on purpose. I just don't – I don't remember, you know, so – but I would like to say it was less than the number I gave then.

(*Id.* at 11:6-12:5.) She also stated, "I think an object hit me at least once on my head," (*id.* at 12:19-20), and "I thought I got kicked. . . . [s]omewhere on my back, like the side or like – like somewhere in the lower area," (*id.* at 13:18-22).[10]

---

[10] The parties also dispute whether Deputy Leyva said "that's what you get, you dyke bitch." (Doc. Nos. 43 at 77:9-15, 34-3 at 5:17-18). The comment is material to intent, which in turn is material to punitive damages Plaintiff seeks under 42 U.S.C. § 1983.

Although each party claims their version of events is supported by the record, courts should only reject one party's version of the events when it is so blatantly contradicted by the record, including video evidence, that no reasonable jury could believe it. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The materials submitted by the parties, including the video evidence, do not support or refute either party's version of events to the point where summary judgment could be appropriate. Although the video evidence shows the moment when Bary contacted the suspects, it does not clearly show Bary biting Rivera, Plaintiff kicking Bary, Plaintiff being handcuffed, the Deputies striking Plaintiff, or the location of Plaintiff's hands. Accordingly, multiple genuine disputes of material fact exist, including whether Plaintiff was handcuffed prior to being struck, whether Deputy Leyva punched Plaintiff while she was kicking Bary, whether Deputy Leyva had the opportunity to protect Bary by means other than punching Plaintiff, and whether Plaintiff was resisting arrest and hiding her hands when she was struck by Deputy Edwards. These genuine issues of material facts indisputably bear on the ultimate question of whether excessive force was ever used against Plaintiff, and if so, by whom and under what circumstances.

In considering whether to grant summary judgment, the evidence must be viewed in the light most favorable to Plaintiff and the court must accept the version of events most favorable to her. *Drummond v. City of Anaheim,* 343 F.3d 1052, 1054 n.1 (9th Cir. 2003). Accordingly, the court must accept Plaintiff's version that Deputy Leyva ordered Bary to attack Plaintiff and Rivera even though he knew where they were located, saw them lying on their backs with their hands raised, and heard them say "we surrender." He did not have objectively reasonable cause to suspect they were violent, only that they wanted to evade arrest. He did not give any warning about Bary, or at least not one that could be heard. There were at least three other officers nearby. When Bary bit Rivera, Plaintiff defended her wife by kicking Bary. Plaintiff was put on her stomach and handcuffed and then struck multiple times in the head and back, which included at least one punch in the head from Deputy Leyva and four strikes with a flashlight to the right shoulder area from Deputy Edwards. Plaintiff may have also been kicked. At some point thereafter, Deputy Leyva

18cv1603 JM (WVG)

said to Plaintiff, "that's what you get, you dyke bitch." These facts, though relying primarily on Plaintiff's credibility, are not so blatantly contradicted by the record that no reasonable jury would believe them to be true. Furthermore, as discussed below, these disputed facts are clearly material to the determination of whether the Deputies' use of force was excessive and, therefore, preclude the court from finding that the Deputies are entitled to qualified immunity.

### B. Qualified Immunity

The Ninth Circuit has found that qualified immunity "was conceived as a summary judgment vehicle, and the trend of the Court's qualified immunity jurisprudence has been toward resolving qualified immunity as a legal issue before trial whenever possible." *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017). "[C]omparing a given case with existing statutory or constitutional precedent is quintessentially a question of law for the judge, not the jury." *Id.*

In addressing qualified immunity at summary judgment in excessive force cases, the court must determine (1) whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated the Fourth Amendment's right against excessive force, and (2) whether the right in question was clearly established at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656 (internal citation omitted).

### 1. Excessive Force

Under the Fourth Amendment, the right to make an arrest necessarily carries with it the right to use some degree of physical coercion to effect it. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio,* 392 U.S. 1, 22-27 (1968). Police officers are not required to use the least intrusive degree of force possible. *See Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994). Police may use only such force to effect an arrest as is "objectively reasonable" under the circumstances. *Graham*, 490 U.S. at

397 (1989); *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2001).

### a. Type and Amount of Force Used

The first step in an excessive force inquiry requires the court to assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (citations omitted), *cert. denied*, 138 S. Ct. 1283 (2018). The inquiry must be conducted on a case-by-case basis because it is a "highly fact-intensive task for which there are no per se rules." *Id.* (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011)).

The Deputies argue the force used on Plaintiff was not excessive because Deputy Leyva "only" punched Plaintiff once and Deputy Edwards "only" struck Plaintiff four times with a "thin, 1.7 pound" flashlight. (Doc. No. 34-1 at 18.) The facts that Deputy Leyva only punched Plaintiff once and that Deputy Edwards' flashlight weighed 1.7 pounds are not, in and of themselves, supportive of reasonableness. *See Santos*, 287 F.3d at 853-54 (shoving can amount to excessive force if unreasonable). Moreover, punching, kicking, and/or hitting with a flashlight are intermediate levels of force that significantly intrude on Fourth Amendment rights. *See Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1161-62 (9th Cir. 2011) (strikes with an impact weapon "capable of inflicting significant pain and causing serious injury" are generally considered intermediate force); *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1147 (E.D. Cal. 2016) ("Generally, impact blows by punching or kicking are considered 'significant force.'") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007)).

The intrusion is mitigated somewhat, however, by Plaintiff's lack of immediate injury. (Doc. No. 34-1 at 18-19.) The lack of injury, therefore, can support the reasonableness of force. *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) ("We may infer from the minor nature of a plaintiff's injuries that the force applied was minimal. While injuries are not a precondition to section 1983 liability, their absence can suggest a lesser degree of force when that force is of the type likely to cause injuries.") (internal

18cv1603 JM (WVG)

citations omitted). Here, one would expect some bruising or swelling to result from a punch to the head and several strikes from a flashlight, yet there is no indication of any such injury. *See Felarca*, 891 F.3d at 817 (finding minimal force where injuries would normally be expected). The medic on the scene, however, found "no obvious visual signs of trauma." (Doc. No. 34-9 at 269.) A photo of Plaintiff's face taken at the scene by Deputy Edwards, including one of her right cheek where Deputy Leyva claims to have punched her, shows no visible injuries. (*Id.* at 167; Doc. No. 34-2 at 5.) The emergency room doctor's notes state "[t]here is no evidence clinically, by either history, physical exam, or diagnostic studies, of any significant injuries to the head, face, neck, back, chest, head, abdomen or extremities." (Doc. No. 43 at 133.) The lack of injury therefore provides some support that the Deputies' strikes, in and of themselves, were not excessively forceful. As discussed below, however, the reasonability of striking Plaintiff at all does not comport with Plaintiff's version of the facts.

### b.    The Government's Interest

The second step in an excessive force analysis under the Fourth Amendment is to evaluate the government's interest in the use of force. *Lowry*, 858 F.3d at 1257. That interest is assessed by considering: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* (citing *Graham*, 490 U.S. at 396. These factors are not exclusive, however, and the court must examine the totality of circumstances and consider other factors when appropriate. *Id.*; *see also Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994) ("Other courts have supplemented these factors with such matters as . . . . whether more than one arrestee or officer was involved [and] whether other dangerous or exigent circumstances existed at the time of the arrest[.]"). Finally, as the Supreme Court explained in *Graham*:

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth

Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

490 U.S. at 396-97 (internal citations and quotation marks omitted).

### i. Severity of the Crime at Issue

The Deputies argue the force used on Plaintiff was reasonable because they knew she had a felony warrant. (Doc. No. 42 at 7.) This factor provides only minimal support, however, because the Deputies did not know whether the basis for the warrant involved violence. (Doc. No. 34-1 at 23.) While "outstanding felony warrants are not to be taken lightly," "[if] the record does not reveal the *type* of felony for which [a suspect] was wanted, the existence of the warrants is of limited significance" and is "not strong justification for the use of dangerous force." *Chew*, 27 F.3d at 1442 (emphasis in original); *Bryan v. MacPherson*, 630 F.3d 805, 829 n.12 (9th Cir. 2010) ("[W]e have previously suggested that felonies not involving violence provide limited support for the use of significant force under *Graham*.") (citations omitted). The warrants nonetheless provide some support for the Deputies because the Ninth Circuit has also stated that the severity of the crime factor "generally" weighs in favor of the reasonability of the use of force when police have "reason to believe" the suspect committed a "felony-grade offence." *Gonzalez v. City of Anaheim*, 715 F.3d 766, 770 (9th Cir. 2013), *rev'd on other grounds on reh'g en banc*, 747 F.3d 789 (9th Cir. 2014) (*citing Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012)). Although the police in *Gonzalez* and *Coles* witnessed suspects in the act of committing non-violent felonies, the Deputies here had a similarly strong reason to believe that Plaintiff committed a felony based on her felony warrant.

In addition to knowing that Plaintiff had a felony warrant, the Deputies knew that Plaintiff committed crimes related to fleeing from the police. As pointed out by the Deputies, some courts have found evasion and reckless driving to weigh in favor of the use of force. *See Estate of Martin v. United States*, Case No. 13cv1386 LAB (BGS), 2015 WL 5568049, at *9 (S.D. Cal. Sept. 22, 2015) ("[Police knew the suspect] was attempting to

evade them, and driving with extreme recklessness. These are serious crimes, and weigh in favor of the government's interest in the use of force to apprehend [the suspect by tasing him in his car]."), *aff'd*, 686 F. App'x 419 (9th Cir. 2017); *Skylstad v. Reynolds*, 248 F. App'x 808, 811 (9th Cir. 2007) ("The severity of the crimes of driving at high speeds through residential areas cannot be understated. The car and driver posed an immediate, serious threat to officers and others."). While Plaintiff led police on a lengthy chase during which she sped, ran stop lights, and drove on the wrong side of the road, Plaintiff was not driving recklessly at the point at which the Deputies used force against her. Because the force used was not related to neutralizing the danger posed by Plaintiff's reckless driving, the fact that Plaintiff drove dangerously weighs only minimally, if at all, in favor of the Deputies.

### ii. Threat to Officer Safety

The most important factor in an excessive force analysis is whether the suspect posed a safety threat. *See George*, 736 F.3d at 838. For this factor to weigh in favor of the officers, "the objective facts must indicate that the suspect pose[d] an immediate threat to the officer or a member of the public." *Bryan*, 630 F.3d at 826. The Deputies primarily argue their safety was threatened because they were susceptible to an ambush. (Doc. Nos. 34-1 at 9:6-9, 19:24-20:3, 34-9 at 109:10.) Certainly, numerous facts support the reasonableness of the Deputies' initial concern for their own safety. They were searching for two suspects wanted for unknown felonies in a dark, undeveloped, and unfamiliar area with ample natural hiding places. The Deputies also had reason to believe Plaintiff and Rivera were familiar with the area given that it was on or near their property. Both suspects had also demonstrated a commitment to avoiding arrest based on the lengthy pursuit on which they had just led police.

Favorable conditions for an attack on police do not, however, necessarily constitute objective facts indicating an immediate threat justifying the use of force. Here, the opportunity for Plaintiff and Rivera to ambush the Deputies was greatly diminished, if not eliminated, because a police helicopter was watching the suspects with night vision

equipment and directing the Deputies to the suspects' exact location. Furthermore, while the Deputies repeatedly argue they did not know whether the suspects had weapons or could gain access to weapons, (Doc. No. 34-1 at 6:8-9, 9:9, 10:7, 10:15-18, 13:18-19, 20:7-8), the Deputies were aware the helicopter crew could see the suspects clearly enough to describe their movements. At no point did the helicopter crew advise the Deputies that the suspects were armed or hiding. Instead, the helicopter repeatedly informed the Deputies that the suspects were lying down underneath some trees. (*See* Doc. No. 43 at 44 ("The K-9, if you were to turn right, right now. Turn your flashlight to the right. To the right, yeah. Right there, directly, you're directly on them right now. They're lying down, underneath some trees. It's doesn't look too thick, but you might not be able to see them, yeah, like we can see them."); 39-40 ("If you go straight and walk like right off the edge of that down into the brush line, that's where these two are lying down under the trees.").) Finally, at the point at which force was used on Plaintiff, she was not hidden, and according to her, she was lying on her stomach in handcuffs or was being held down while being handcuffed. Even if the Deputies could not see the suspects and were, therefore, vulnerable to an ambush at the moment Deputy Leyva gave Bary the apprehension command, this was no longer the case when, seconds later, Bary bit Rivera and the Deputies saw the suspects on the ground.[11]

As pointed out by the Deputies, the Ninth Circuit has held, in two somewhat similar cases, that officers were justified in the use of a police dog because they were entitled to assume that a hidden suspect posed an immediate threat where the officers did not know if

_____

[11] The Deputies do not argue that Plaintiff's attack on Bary was itself sufficient to objectively indicate an immediate threat to their own safety, or that an attack on a police dog constitutes a threat to the safety of "officers or others" as contemplated in *Graham*. The Deputies cite no authority, and the court is aware of none, addressing the degree of justification that an attack on a police dog provides for the use of force by police officers. The court declines to address the issue here given the parties' multiple genuine disputes of material fact, including whether a reasonable officer in Deputy Leyva's position would have viewed Plaintiff's attack on Bary, at least in part, as an act in defense of her wife against an unjustified bite from a police dog.

18cv1603 JM (WVG)

the suspect was armed and the suspect ignored warnings that the police dog would be released. First, in *Miller v. Clark Cty.*, 340 F.3d 959, 965 (9th Cir. 2003), police pursued a wanted felon who was pulled over during a traffic stop and fled on foot into a dark and wooded area with which the suspect was familiar. *Id.* at 961. Before entering the woods, the officers warned of the dog's presence. *Id.* When released, the dog located and bit the suspect. *Id.* In finding the dog's bite to be a reasonable use of force, the Ninth Circuit relied heavily on the unique ability of police dogs to eliminate the opportunity for hiding suspects to ambush pursuing police. *Id.* at 966-68. Second, in *Lowry*, 858 F.3d at 1258, police responded to a silent burglar alarm in a dark commercial building with an open door. Before entering, the police warned of the presence of a police dog, and when released, the dog located and bit a sleeping employee who had unwittingly tripped the alarm. *Id.* In finding use of the police dog to be reasonable, the Ninth Circuit relied on the special danger presented by burglary suspects. *Id.*

*Miller* and *Lowry* are distinguishable because the Plaintiff here was located before the police dog was released. Rather, Plaintiff was struck by police after the police observed her kick the police dog during the handcuffing process. As already noted, the threat that Plaintiff could ambush police was greatly mitigated, if not eliminated, by the presence of a police helicopter equipped with night-vision equipment advising the Deputies as to Plaintiff's and Rivera's precise location and movements. Because the Deputies knew Plaintiff's location, could see her prior to using force against her, and used a far different type of force than used on the plaintiffs in *Miller* and *Lowry*, those cases do not require finding that the Deputies acted reasonably.[12]

### iii.   Flight and Resisting Arrest

There is no dispute that at the point of apprehension, Plaintiff was not actively fleeing. Furthermore, at the point force was used against her, she claims she was being

---

[12] The police in *Miller* also knew the suspect was wanted for a dangerous felony, may not have been law enforcement friendly, and might be armed. *Miller*, 340 F.3d at 961. Also, the suspects here were not suspected of burglary, as was the case in *Lowry*.

handcuffed or was already handcuffed. The Deputies concede "she was no longer running away when the deputies encountered her," but they argue she was still "evading arrest." (Doc. No. 34-1 at 24-25.) The Ninth Circuit has found that when a suspect flees then hides, the suspect's flight has terminated, at least temporarily. *Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994). A reasonable officer would not then necessarily conclude that punching or striking Plaintiff was warranted to prevent flight.

There is no dispute, however, that Plaintiff violently kicked a police dog. An attack on a police dog could reasonably be construed by an objective officer as an attempt to resist arrest, even if the suspect was already handcuffed. In such cases, the application of some force might well be reasonable to stop the attack and effectuate the arrest. Here, however, a potential question exists as to whether an objectively reasonable officer in Deputy Leyva's position would have perceived the attack on Bary as one of resistance to arrest, rather than an act in defense of another. Moreover, Deputy Edwards does not suggest that his use of force was in response to Plaintiff's attack on Bary. Plaintiff's attack on Bary therefore provides some support for Deputy Leyva's punch, but not Deputy Edwards' strikes.[13]

### iv.     Less Intrusive Alternatives

Finally, whatever objectively reasonable concerns the attack on Bary might have raised for police, the evidence indicates that a reasonable officer in Deputy Leyva's position would have resolved those concerns using less restrictive means. Deputy Leyva admittedly punched Plaintiff in the head rather than commanding Bary to move away from Plaintiff or removing Bary away from Plaintiff himself. The record suggests Bary was on

---

[13] The video evidence also supports Deputy Leyva's claim that Bary's bite and Deputy Leyva's punch were reasonable because, if only for an instant, Deputy Leyva had the responsibility of controlling both suspects while outnumbered. (Doc. No. 34-1 at 12:7-9.) This does not weigh heavily in his favor, however, given that Bary, though not a human law enforcement officer, surely possessed his own formidable apprehension abilities and was in fact subduing, or at least preoccupying, Rivera with his bite so that Deputy Leyva could focus his attention on controlling Plaintiff.

a leash while Plaintiff was kicking him. (*See* Doc. Nos. 34-1 at 11:10, 34-9 at 115:11.) While officers are not required to use the least intrusive means of responding to an exigent situation, they must act within a reasonable range of conduct. *Glenn v. Washington Cty.*, 673 F.3d 864, 876 (9th Cir. 2011). Clear, reasonable, and less intrusive alternatives to the force employed weighs against a finding that the use of force was reasonable. *Id.* Plaintiff's attack on Bary was undoubtably an immediate threat to the canine's safety. Plaintiff's use of violence against Bary may have also objectively signaled a propensity to use violence against the Deputies. When asked why he did not simply remove Bary while Plaintiff was kicking him, however, Deputy Leyva gave a somewhat ambiguous and non-responsive answer, stating:

> Bary is my partner. We go to work every day together. I know that dog would give his life for me, and I'm not going to sit there and just let somebody beat the crap out of my dog. So I told her to stop kicking him. She didn't. I lunged forward to get her away from him, which, you know, unfortunately, made the bite be a little bit longer. But once I got her away from Bary and stop kicking him [sic], then I went and grabbed a hold of Bary and took him off the bite.

(Doc. No. 34-9 at 123-24.) Also, as previously noted by this court, Sheriff's Department guidelines may have required Deputy Leyva to consider less intrusive alternatives than punching Plaintiff in the head. (Doc. No. 13 at 11 n.8.) To the extent Deputy Leyva was justified in punching Plaintiff in the head in order to protect Bary from Plaintiff's kicks and subdue a demonstrably violent suspect, the apparent availability of less intrusive alternatives may undermine the reasonableness of his actions. Based on the foregoing, and taking the facts in the light most favorable to Plaintiff, a reasonable jury could find that Deputy Leyva's use of force was not objectively reasonable.

## 2. Clearly Established Right

Police officers have qualified immunity from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). Clearly established rights are those that are "'sufficiently clear that every reasonable official would

have understood that what he is doing violates that right.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Courts do not require a case to be directly on point, "'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Supreme Court has repeatedly instructed courts "'not to define clearly established law at a high level of generality.'" *Id.* (quoting *Ashcroft*, 563 U.S. at 742)). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Id.* The inquiry must be conducted "'in light of the specific context of the case, not as a broad general proposition[.]'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the . . . . excessive force [doctrine] will apply to the factual situation the officer confronts.'" *Id.* (quoting *Saucier*, 533 U.S. at 202).

Consistent with this court's previous order denying in part Defendants' motion for judgment on the pleadings, (Doc. No. 13 at 15-16), several cases support the clear establishment of the right to be free from being struck by police under the particular circumstances present here, which include allegations that Plaintiff was struck while on the ground, handcuffed, or while being handcuffed. In *Drummond*, 343 F.3d at 1052-53, officers sat on a mentally ill plaintiff's back and neck, asphyxiating him, while he was on the ground and unarmed. The court held that such severe force was unreasonable because plaintiff was handcuffed on the ground, was not resisting arrest, and posed a minimal threat to anyone's safety. *Id.* at 1057-59. In *Smith v. City of Hemet*, 394 F.3d 689, 702-03 (9th Cir. 2005), the officers pepper sprayed and sicced a police dog on the plaintiff even though he was on the ground, face-down, unarmed, and wearing pajamas. The court found the force was unreasonable, in part, based on the availability of alternative methods for subduing the suspect even though he disregarded the officers' orders, refused to put up his

hands, and was shouting expletives. *Id.* at 703. In *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007), an officer slammed the plaintiff head-first into a wall and then punched him in the face while plaintiff was on the ground. The court found the force unreasonable in light of the minimal threat and flight risk plaintiff presented and the availability of alternatives. *Id.* at 1055-56. Finally, in *Blankenhorn*, 485 F.3d at 480, the court held that punching the plaintiff while he was on the ground being handcuffed was unreasonable force even though the plaintiff initially resisted arrest.

These cases clearly establish that it is unlawful for an officer to strike a suspect while she is on the ground handcuffed, or while being handcuffed, and not posing an immediate threat to officers or the public. The circumstances here are unique, of course, because Plaintiff admittedly kicked a police dog while she was on the ground before force was used against her. As noted above, kicking a police dog might justify the use of force in certain circumstances. The apparent availability of less intrusive means for controlling Plaintiff and/or protecting Bary, however, as well as the lack of clarity in the record as to when and why Plaintiff kicked Bary, when and why Deputy Leyva punched Plaintiff, or even what force was used against Plaintiff, preclude the court from finding on summary judgment that either Deputy is immune from liability on the basis of qualified immunity.

## IV. CONCLUSION

For the forgoing reasons, the Deputies' Motion for Summary Judgment, or in the Alternative for Summary Adjudication, is **DENIED**.

IT IS SO ORDERED.

DATED: January 23, 2020

JEFFREY T. MILLER
United States District Judge